Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/09/2026 12:06 AM CST

- 34 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

R. Michael Gross, M.D., and C. Michael Kelly, M.D., appellants, v. GIKK Investments, LLC, et al., appellees.

___ N.W.3d ___

Filed February 3, 2026.    No. A-25-012.

1.  **Summary Judgment: Appeal and Error.** An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

2.  ____: ____. An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

3.  **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews de novo whether the trial court applied the correct legal standards for admitting an expert's testimony, and an appellate court reviews for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.

4.  **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

5.  **Appeal and Error.** Error without prejudice provides no ground for appellate relief.

6.  **Evidence: Appeal and Error.** To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about the evidence admitted or excluded.

7.  **Contracts.** The interpretation of a contract and whether a contract is ambiguous are questions of law.

- 35 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

8. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.

9. **Summary Judgment.** Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

10. **Summary Judgment: Proof.** The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.

11. **Contracts.** The meaning of a contract and whether a contract is ambiguous are questions of law.

12. ____. In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous.

13. ____. A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.

14. **Contracts: Words and Phrases.** A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.

15. **Contracts.** The meaning of an ambiguous contract is generally a question of fact.

16. **Contracts: Words and Phrases.** Trade terms, legal terms of art, numbers, common words of accepted usage, and terms of a similar nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent.

17. **Corporations: Sales: Words and Phrases.** The phrase "all, or substantially all," means a sale of corporate assets that, quantitatively or qualitatively, would result in a fundamental change in the nature of the corporation.

18. **Corporations: Sales.** The determinative factor in assessing whether a sale constitutes all or substantially all of a business is whether the sale changes the nature of the corporate activity.

19. **Contracts: Summary Judgment: Questions of Law.** The interpretation and construction of a contract are questions of law, which a court can resolve on summary judgment.

20. **Contracts.** A contract should be read so that all of its terms are given meaning.

- 36 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

21. _____. A court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include.

22. **Contracts: Intent.** A court should avoid interpreting contract provisions in a manner that leads to unreasonable or absurd results that are obviously inconsistent with the parties' intent.

23. **Expert Witnesses: Evidence.** Expert testimony is relevant and admissible only if it tends to help the trier of fact understand the evidence or determine a fact issue, and expert testimony concerning a question of law does not tend to accomplish either of these goals. Consequently, expert testimony concerning a question of law is generally not admissible in evidence.

Appeal from the District Court for Douglas County: DEREK R. VAUGHN, Judge. Affirmed.

Richard P. Jeffries and Nicholas J. Rock, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellants.

Patrick D. Pepper and Matthew G. Munro, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellees.

PIRTLE, WELCH, and FREEMAN, Judges.

WELCH, Judge.

## I. INTRODUCTION

R. Michael Gross, M.D., and C. Michael Kelly, M.D. (collectively the Appellants as appropriate), filed a complaint alleging breach of contract by GIKK Investments, LLC (GIKK); breach of fiduciary duty by managers of GIKK; and breach of fiduciary duties under the Uniform Partnership Act against GIKK; John A. McCarthy, M.D.; Daniel L. Gaffney, M.D.; Kayvon D. Izadi, M.D.; and Charles E. Rosipal, M.D. (collectively the Appellees). The Appellees filed a motion for summary judgment, which was granted by the Douglas County District Court. Drs. Gross and Kelly appeal, alleging error regarding the exclusion of opinions by their expert witness and the granting of summary judgment in favor of the Appellees on their breach of contract claims. For the reasons set forth herein, we affirm.

- 37 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

## II. STATEMENT OF FACTS

### 1. Background

Gross Iwerson Kratochvil & Klein, P.C. (the P.C.), was a professional corporation formed to operate as an orthopedic surgery practice in Omaha, Nebraska. As relevant to this appeal, in 2006, the physicians associated with the P.C. separately formed a limited liability company, GIKK, to acquire a minority interest in Midwest Surgical Hospital, LLC (MSH).

The P.C. referred to its owners-managers as "partners." Relevant partner decisions were captured in meeting minutes. Partner minutes from 2010 reflected that physicians would qualify for partner status in the P.C. and ownership status in GIKK following 2½ years of employment as a physician in the P.C., along with the successful passing of boards. At the time GIKK was formed, there were 10 physicians serving as partners in the P.C., and each physician was granted a 10-percent membership interest in GIKK. Drs. Gross and Kelly were two of the original partners in the P.C. and were members of GIKK who signed GIKK's "Operating Agreement." By the time Dr. Gross retired, GIKK had acquired an approximately 25-percent ownership interest in MSH.

GIKK's Operating Agreement provided that GIKK was formed to own shares in MSH and that the members of GIKK owned membership units in GIKK. The Operating Agreement further provided that upon retirement of a member from the practice of medicine, a mandatory redemption event occurred whereby GIKK would redeem that individual's member units in GIKK for $1,000. Partners of the P.C. required its employee physicians to enter into employment agreements wherein they each agreed to a mandatory retirement of surgical privileges at age 67½, subject to continued surgical privileges at the discretion of the other partners. Regardless of whether surgical privileges continued after age 67½, a partner in the P.C. and continuing member in GIKK remained entitled to continued earnings and distributions from both the P.C. and GIKK for

- 38 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

2½ years until reaching age 70. At age 70, shares in the P.C. and membership interests in GIKK were redeemed. The combination of 2½ years of earnings after age 67½ with the $1,000 redemption price constituted full remuneration for the redemption of ownership interests in both entities.

## 2. 2014 AMENDMENT TO GIKK's
### OPERATING AGREEMENT

In 2014, Dr. Gross became the first physician to reach the mandatory retirement age of 70. However, in December 2014, Dr. Gross entered into a "Physician Services Agreement" with the P.C. and GIKK wherein the parties agreed to allow Dr. Gross to continue to provide physician services past the normal retirement age. Although the parties agreed to allow Dr. Gross to perform physician services for specified remuneration beyond age 70, the agreement provided that the P.C. and GIKK would redeem his shares and membership units effective December 31, 2014, and that he would no longer be a shareholder or member in the P.C. or GIKK after that date. Notwithstanding this redemption, as part of the Physician Services Agreement, the parties agreed that, following the redemption, "if substantially all of the Units in LLC owned by the owners of LLC (or substantially all of the assets owned by LLC) are sold to a bona fide purchaser before December 31, 2029," then the LLC would pay a portion of the proceeds equal to that which Dr. Gross would have received had he still owned his units on the day of the sale. Dr. Gross specifically agreed that other retiring members could be granted a postretirement share of sale proceeds or that additional members could be added to the LLC, "which may have the effect of reducing Dr. Gross' future share." Dr. Gross agreed that "the owners of LLC may amend its Operating Agreement (and enter into other agreements) without the consent of Dr. Gross, provided that no such amendment (or other agreements) would operate in derogation of the rights of Dr. Gross created in this paragraph."

- 39 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

At the time Dr. Gross entered into the Physician Services Agreement, the members of GIKK agreed to amend the Operating Agreement consistent with Dr. Gross' Physician Services Agreement, which became effective on December 31, 2014. The amendment provided:

a. The following shall be added as Sec. 17.2 of the agreement:

"17.2 Participation in Proceeds After Original Continuing Member's Sale. If, following the sale, redemption or forfeiture of an Original Continuing Member's Interest in the Company, *substantially all of the Units in [GIKK] owned by the Members of [GIKK] (or substantially all of the assets owned by [GIKK]) are sold to a bona fide purchaser within fifteen years after such sale, redemption or forfeiture,* then [GIKK] will cause that former Original Continuing Member (or his or her surviving spouse, if the former Original Continuing Member is then deceased but left a surviving spouse, but if neither the former Original Continuing Member or a surviving spouse is then living, then no such payment shall be due) to receive such portion of the sales price (whether in cash or such other consideration provided in such sale from the purchaser) equal to that which the former Original Continuing Member would have received had the former Original Continuing Member still owned [GIKK] Units on the date of such sale (i.e. which would have been received either as a direct seller of such units or, in the event of the sale by [GIKK] of its assets, then the amount which would have been received in exchange for his or her Company Units in liquidation of [GIKK]). In all events, the former Original Continuing Member's share of such proceeds shall be based on the net amount of such sale proceeds (not including earnings accruing after the sale, redemption or forfeiture of the former Original Continuing Member's interest), after payment of all debts and expenses, such calculation to

- 40 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

be otherwise made in the same way as that which applies to the other Members of [GIKK]. No other amounts with respect to [GIKK] Company Units will be due or owing to the former Original Continuing Member upon or after the date of the former Original Continuing Member's sale, redemption or forfeiture, other than as set forth herein (i.e. the former Original Continuing Member shall not be entitled to any earnings of [GIKK] accruing after the date of the sale, redemption or forfeiture). Each Original Continuing Member agrees that other Original Continuing Members of [GIKK] may be granted a similar share of sale proceeds, which may have the effect of reducing each Original Continuing Member's future share under this provision. Each Original Continuing Member also agrees that additional members may be added to [GIKK], which may also have the effect of reducing each Original Continuing Member's future share under this provision. Each Original Continuing Member further agrees that he or she has or will have no ownership or voting rights in [GIKK] after a sale, redemption or forfeiture of the Original Continuing Member's Interest in [GIKK], and that the Members of [GIKK] may amend this Operating Agreement (and enter into other agreements) without the consent of any former Original Continuing Member, *provided that no such amendment (or other agreements) would operate in derogation of the rights of such former Original Continuing Member.* The parties acknowledge that by separate agreement between [GIKK] and [Dr. Gross], the ownership interest of Dr. Gross was purchased effective December 31, 2014. *Therefore, while he is not continuing as a Member, and is therefore not an Original Continuing Member, provisions comparable to the provisions of this Section 17.2 apply to the benefit of Dr. Gross pursuant to such separate agreement.*"

- 41 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

b. The following shall be added as Sec. 18.28 of the agreement:

"18.28 Original Continuing Member: *A Member who owned an interest in* [*GIKK*] *on the Effective Date and who is a Member as of January 1, 2015.*"

c. Subject to the alterations and amendments herein contained, the Member(s) and Manager(s) do hereby ratify and affirm said Limited Liability Company Operating Agreement in all other respects.

(Emphasis supplied.) As such, pursuant to the Physician Services Agreement and the amendment to the Operating Agreement at § 17.2, a "former Original Continuing Member," such as Dr. Gross, and subsequently Dr. Kelly, was entitled to receive payment upon either the sale of "substantially all" of the units in GIKK or substantially all the assets of GIKK for 15 years after the redemption of their shares, even though they were no longer partner physicians at the P.C. or members of GIKK.

### 3. Retirement

Dr. Gross subsequently retired from performing physician services for the P.C. in 2016. Another original member, Dr. Kelly, retired in 2019. At the time of their retirements, both Dr. Gross' and Dr. Kelly's membership units in GIKK were redeemed for lump-sum payments as provided in GIKK's Operating Agreement.

### 4. 2020 Amendment to GIKK's Operating Agreement

After Drs. Gross and Kelly retired, the P.C. grew and merged into the entity now known as MD West One, P.C. In July 2020, the existing members of GIKK agreed to amend the retirement policy and process in its Operating Agreement. Pursuant to the terms of the "Seventh Amendment to the Operating Agreement," which we refer to as the "2020 Amendment," instead of a retired physician's receiving $1,000 for the redemption of his or her membership units in GIKK,

- 42 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

the physician would receive a single buyout in accordance with MSH's "process methodology." As part of the 2020 Amendment, GIKK members specifically agreed that any former members with rights under § 17.2, including Drs. Gross and Kelly, would retain those rights.

## 5. ADDITIONAL DOCTORS' BUY-IN TO GIKK

After the 2020 Amendment to GIKK's Operating Agreement, seven new physicians, who became partners in the P.C., were offered the opportunity to invest in GIKK. Those seven physicians made capital contributions of $1,517,876.76 each to GIKK. These contributions, along with additional capital contributions of $131,989 each from the 14 existing GIKK members, resulted in GIKK's raising more than $12 million that GIKK utilized to acquire an additional approximately 10-percent ownership interest in MSH, which raised GIKK's ownership in MSH from approximately 25 percent to 35 percent.

As a result of these additional investment proceeds and continuing operations, MSH grew as a company and continued its historical practice of distributing cash proceeds to its owners, which included GIKK. GIKK then distributed those proceeds to the existing members of GIKK. Although Drs. Gross and Kelly had previously received these types of distributions when they were members of GIKK, they did not receive any such distributions following their retirement and the redemption of their membership units in GIKK.

## 6. DR. MCCARTHY'S RETIREMENT

In 2021, Dr. McCarthy retired at the age of 65, and pursuant to the amended Operating Agreement, Dr. McCarthy surrendered his shares in GIKK and received the agreed-upon formula buyout as provided in the amended Operating Agreement. In exchange for his member units upon retirement, in accordance with the revised buyout formula from the 2020 Amendment, Dr. McCarthy received $1,181,633.21 from the buyout. This buyout was in lieu of the old formula from the P.C. and GIKK, which would have entitled Dr. McCarthy

- 43 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

to distributions from the P.C. and GIKK for 2½ years and $1,000 in redemption proceeds. The record provides testimony that Dr. McCarthy received less money from his redemption from both entities under the new formula than he would have received under the old one. At the end of 2021, GIKK owned approximately a 35-percent interest in MSH.

### 7. 2021 Sale of 49.9 Percent of MSH

In 2021, in an effort to add a strategic investor and grow the value of MSH, GIKK and other MSH shareholders sold 49.9 percent of their ownership interest in MSH as of December 31, 2021, to Surgery Center Holdings, Inc., for $47 million. Following the transaction, GIKK still retained ownership of 17.52337 percent of MSH. Following that transaction, GIKK continued to expand its interests in MSH, and as of December 31, 2022, GIKK owned 18.39954 percent of MSH.

### 8. Complaint and Pretrial Motions

In September 2022, Drs. Gross and Kelly filed a complaint against the Appellees alleging the series of transactions that occurred following their retirement and redemptions resulted in distributions to other members of GIKK and excluded them, which constituted a breach of contract by the Appellees and a breach of fiduciary duty by Dr. McCarthy as the manager of GIKK. The complaint was later amended with the operative complaint adding additional individual defendants and asserting the following claims for relief: breach of contract, breach of fiduciary duty by GIKK managers, and breach of fiduciary duties under the Uniform Partnership Act. The Appellants sought damages totaling "not less than $4,646,984.79 each."

Thereafter, the Appellants filed a notice that they intended to call Edward A. Morse, a professor of law, as an expert witness. Attached to the notice was a report that set forth the substance of the facts and opinions on which Professor Morse was expected to testify and the summary and grounds for each opinion. Professor Morse's report stated, in part:

- 44 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

Based upon his knowledge, skill, experience, training, and education in the fields of taxation, accounting, and business associations, and in reliance upon the bases and reasons stated below, Professor . . . Morse holds the following opinions to a degree of reasonable certainty:

1. Through sales of LLC units and sales of underlying assets, GIKK . . . sold "substantially all" of its assets between July 2020 and December 31, 2021.

2. The LLC and its managers entered into agreements in derogation of the rights of Drs. Gross, Kelly, and Fitzgibbons, including the following transactions and related distributions to members other than Drs. Gross, Kelly, and Fitzgibbons:

a. The July 2020 sale of 33.33 [percent] of GIKK . . . units to seven Methodist physicians followed by cash distributions to the then-current members [of GIKK] other than the newly admitted members;

b. The July 2021 sale of approximately 4.7619 [percent] of [GIKK's] assets to fund the full redemption of . . . [Dr. McCarthy] incident to his retirement; [and]

c. The December 31, 2021, sale of 49.9 [percent] of [GIKK's] ownership interest in [MSH] to Surg[ery] Center Holdings, Inc., followed by distributions to the then-current LLC members.

Professor Morse's report included other opinions, including that Drs. Gross and Kelly have been harmed to the extent of the damages set forth in their answers to interrogatories; that other distributions from GIKK to its members likely caused additional damages to Drs. Gross and Kelly; that GIKK's managers breached duties of care and loyalty to Drs. Gross and Kelly; and that Drs. Gross and Kelly are entitled to "full redemption of their interest . . . based on valuing the remainder of the underlying assets of [GIKK]."

The Appellees responded by filing a motion to exclude the opinions of Professor Morse "pursuant to Nebraska Rule of Evidence § 27-702 and *Schafersman v. Agland Coop*, [262]

- 45 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

Neb. 215, 225, 631 N.W.2d 862, 872 (2001)." After a hearing thereon, the district court excluded Professor Morse's testimony in its entirety on the grounds that his "methodology of 'monetization' is unproven and unreliable" and that he makes "ultimate conclusions about what certain terms such as 'substantially all' and 'derogation' mean when used in the context of the contract. These types of opinions are simply not admissible as expert testimony. These legal conclusions are not helpful to the trier of fact and, therefore, are inadmissible."

## 9. THE APPELLEES' MOTION
### FOR SUMMARY JUDGMENT

In July 2024, the Appellees filed a motion for summary judgment, and in support of the motion, they submitted an index of evidence and annotated statement of undisputed facts. In response, the Appellants filed an annotated statement of disputed and supplemental facts and an evidence index in opposition to the Appellees' motion for summary judgment. At the hearing on the Appellees' motion for summary judgment, numerous exhibits were received into evidence containing facts as previously set forth. Following the hearing, in a detailed order, the district court granted the Appellees' motion for summary judgment. The court noted that the Appellees argued that the case had been brought prematurely. In response, the Appellants raised three arguments: (1) GIKK sold "'substantially all'" of the units or assets owned by GIKK, which triggered the Appellants' rights under § 17.2; (2) the Appellants' rights were derogated by the Appellees; and (3) the Appellees breached their fiduciary duties to the Appellants. The Appellants argued that in respect to these issues, at a minimum, there remained triable issues of fact for a jury to decide.

Regarding the Appellants' claim that GIKK had sold "'substantially all'" of the units in GIKK or "'substantially all'" of the assets owned by GIKK so as to trigger § 17.2 and require a payout for Drs. Gross and Kelly, the district court found that

- 46 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

"[t]he plain meaning of 'substantially all' suggests that GIKK . . . did not sell enough of its assets to trigger section 17.2 and, therefore, the [Appellees'] Motion for Summary Judgement in regard to whether GIKK . . . sold 'substantially all' of its assets is granted."

The court further rejected the Appellants' claims that the 2020 buy-in of additional doctors and the buyout of Dr. McCarthy constituted "'sales'" and that sale of 49.9 percent of GIKK's 35-percent ownership in MSH amounted to a sale of "'substantially all'" of GIKK's assets or member units, noting that "[l]ess that half does not amount to essentially everything or largely but not wholly the total amount."

The court also rejected the Appellants' claim that there had been a derogation of Drs. Gross and Kelly's rights as prohibited under § 17.2. The court stated that "[t]he operative question is whether the condition precedent contained in the Operating Agreement has been met so as to rise to a breach of contract. Without evidence that the condition precedent has been met, there can be no derogation of rights." The court then determined that the provision of § 17.2 providing that GIKK has an enforceable obligation to the Appellants only if "substantially all" of the units or assets owned by GIKK were sold to a bona fide purchaser was a condition precedent to the other language contained in § 17.2 that stated, "Members of [GIKK] may amend this Operating Agreement (and enter into other agreements) without the consent of any former Original Continuing Member, provided that no such amendment (or other agreements) would operate in derogation of the rights of such former Original Continuing Member." And because the condition precedent had not been met, the Appellants did not have a present right to enforce or have a present right that had been "derogated" by the changes made to GIKK's Operating Agreement.

Finally, regarding the Appellants' claim that GIKK's managers breached fiduciary duties to them as "[former] Original Continuing Members," the court found that Drs. Gross and

- 47 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

Kelly were no longer members of GIKK because they became dissociated from GIKK after their retirements and that if Drs. Gross and Kelly were still members of GIKK, the record did not support that a breach of fiduciary duties had occurred, because their rights are contingent on a sale of "substantially all" of GIKK's corporate units or assets.

## III. ASSIGNMENTS OF ERROR

The Appellants' assignments of error, consolidated, renumbered, and restated, are that the district court erred in (1) granting summary judgment (a) finding that GIKK had not sold "'substantially all'" of its assets or ownership as a matter of law because its promise to the Appellants was triggered by (i) the addition of seven new physicians and members for value, (ii) the amendment to the redemption formula followed by the redemption of Dr. McCarthy's membership units, and (iii) GIKK's sale of a 49.9-percent interest in MSH; and (b) finding that the Operating Agreement contained a condition precedent to the Appellees' promise not to enter into any agreements that "'would operate in derogation of the rights of'" the Appellants; and (2) excluding Professor Morse's testimony (a) on the grounds characterized in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (*Daubert/Schafersman*) when the Appellees' expert agreed with Professor Morse's "'method'" and (b) based upon its finding that Professor Morse's testimony consisted entirely of "'legal conclusions'" when Professor Morse expressed factual opinions that quantified the extent of financial harm caused to the Appellants by the Appellees.

## IV. STANDARD OF REVIEW

[1,2] An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *D&M Roofing &*

- 48 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

*Siding v. Distribution, Inc.*, 319 Neb. 707, 24 N.W.3d 850 (2025). An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Id.*

[3,4] An appellate court reviews de novo whether the trial court applied the correct legal standards for admitting an expert's testimony, and we review for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony. *Konsul v. Asensio*, 316 Neb. 874, 7 N.W.3d 619 (2024). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

[5,6] Error without prejudice provides no ground for appellate relief. *Agri Affiliates, Inc. v. Bones*, 265 Neb. 798, 804, 660 N.W.2d 168, 174 (2003). To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about the evidence admitted or excluded. *Buttercase v. Davis*, 313 Neb. 1, 982 N.W.2d 240 (2022), *modified on denial of rehearing* 313 Neb. 587, 985 N.W.2d 588 (2023).

[7,8] The interpretation of a contract and whether a contract is ambiguous are questions of law. *D&M Roofing & Siding v. Distribution, Inc., supra*. An appellate court independently reviews questions of law decided by a lower court. *Id.*

## V. ANALYSIS

The Appellants raise and argue on appeal, restated, that the district court erred in (1) granting summary judgment, because (a) there remained a factual question as to whether three transactions following Dr. Gross' and Dr. Kelly's retirements constituted a sale of substantially all of the units or assets of GIKK in violation of § 17.2 of GIKK's Operating Agreement and

- 49 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

(b) there remained a factual question as to whether the execution of those three transactions constituted a derogation of the Appellants' rights under § 17.2 of the Operating Agreement, and (2) excluding the testimony of Professor Morse as it relates to both of those issues. We will address each of these assignments of error independently.

## 1. SUMMARY JUDGMENT

Before addressing the Appellants' assigned errors, we briefly summarize the standard for reviewing appeals from the grant of summary judgment.

[9,10] Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Ricker v. Nebraska Methodist Health Sys.*, 319 Neb. 628, 24 N.W.3d 344 (2025). The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. *Id*. If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. *Id*.

### (a) Sale of Substantially All of GIKK's
### Membership Units or Company Assets

The Appellants first contend that the district court erred in granting summary judgment because a factual question remained as to whether three transactions following Dr. Gross' and Dr. Kelly's retirements constituted a sale of substantially all of the membership units or assets of GIKK.

Drs. Gross and Kelly were retired physicians whose shares in the P.C. and membership units in GIKK had long since been redeemed. Nevertheless, they brought this lawsuit seeking

- 50 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

monetary damages for business transactions conducted by GIKK following their redemptions. Their right to do so is based upon contractual terms that are found in Dr. Gross' Physician Services Agreement and in § 17.2 of GIKK's amended Operating Agreement. The applicable provisions in those documents preserved a limited trailing interest in proceeds from GIKK in the event of a sale of "substantially all of the Units in [GIKK] owned by the Members of [GIKK] (or substantially all of the assets owned by [GIKK])" to a bona fide purchaser within 15 years after a retired physician's own membership units were redeemed. In short, the Appellants argue that a combination of three transactions that occurred between 2020 and 2021 constituted a sale of substantially all of the units or assets of GIKK, which triggered their right to share in the proceeds from those transactions. The Appellants allege that the first transaction occurred when GIKK issued membership units in GIKK to seven new physicians who joined the P.C. and subsequently invested in GIKK for monetary contributions, the second transaction occurred when members of GIKK amended the Operating Agreement to change the redemption formula upon a physician's retirement and subsequently redeemed Dr. McCarthy's units following his retirement using the revised formula, and the third transaction occurred when GIKK sold 49.9 percent of its ownership interest in MSH to a strategic partner.

The court held that the Appellees were entitled to summary judgment on this issue, as the record demonstrated that there was no genuine issue of material fact in dispute and that the transactions did not amount to a sale of substantially all of the units or assets as a matter of law. The Appellants argue the district court erred in this finding.

Before addressing the transactions independently, in order to determine whether any error occurred, we must first ascertain the meaning of the phrase "substantially all" of the units or assets as contained within the contracts in order to determine whether the identified transactions constituted a sale of

- 51 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

substantially all of the units or assets or did not constitute such a sale, or whether a triable factual question remained on this issue.

[11-15] The meaning of a contract and whether a contract is ambiguous are questions of law. *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 291 Neb. 642, 868 N.W.2d 67 (2015). In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Id.* A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. *Id.* A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* The meaning of an ambiguous contract is generally a question of fact. *Id.*

[16] The outcome of this case, at least in part, depends upon the meaning of the phrase sale of "substantially all of the Units . . . or substantially all of the assets" in relation to certain transactions that occurred after the contract was executed. As the district court noted, neither the Physician Services Agreement nor the amended Operating Agreement defined the phrase "substantially all" in the contracts themselves. But that does not necessarily render the phrase ambiguous. In *Kalkowski v. Nebraska Nat. Trails Museum Found.*, 290 Neb. 798, 862 N.W.2d 294 (2015), the Nebraska Supreme Court was called upon to interpret the meaning of the word "improvements" in a lease contract in which the term was not defined. Under the circumstances, the Nebraska Supreme Court held that, when interpreting the meaning of the word "improvements" in a contract, "[where] [t]he lease agreement [did] not define the term 'improvements[,]' . . . we give the term its plain and ordinary meaning." *Id*. at 804, 862 N.W.2d at 300-01. In ascertaining the plain and ordinary meaning of the word "improvements," the court further held:

> "Trade terms, legal terms of art, numbers, common words
> of accepted usage and terms of a similar nature should be

- 52 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent." Our interpretation of the term "improvements," as a legal term of art, should be informed by its typical usage within farm lease agreements.

*Id*. at 804-05, 862 N.W.2d at 301.

We make a similar finding here. In *State ex rel. Columbus Metal v. Aaron Ferer & Sons*, 272 Neb. 758, 766, 725 N.W.2d 158, 165 (2006), the Nebraska Supreme Court was called upon to define the meaning of "'a sale . . . of all, or substantially all,'" of property as it related to the use of that term in a statute governing dissenters' rights. In identifying the policy behind dissenters' rights statutes, the Nebraska Supreme Court held:

This court has previously noted the policy behind these provisions of the dissenters' rights statutes. We stated:

"At common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation. This made it possible for an arbitrary minority to establish a nuisance value for its shares by refusal to cooperate. To meet the situation, legislatures authorized the making of changes by majority vote. This, however, opened the door to victimization of the minority. To solve the dilemma, statutes permitting a dissenting minority to recover the appraised value of its shares, were widely adopted."

*Id.* at 765, 725 N.W.2d at 164.

More specifically, the particular dissenters' rights statute discussed in *State ex rel. Columbus Metal v. Aaron Ferer & Sons, supra*, triggered dissenters' rights when controlling shareholders approved a sale of all, or substantially all, of the assets. Accordingly, the Nebraska Supreme Court turned to the meaning of that phrase in that context, holding as follows:

Resolution of appellants' claim on appeal requires a determination of the meaning of "all, or substantially all" as used in the context of § 21-20,138(1)(c), a question this court has not previously addressed. The dissenters' rights

- 53 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

statutes do not define the phrase "all, or substantially all."
We note, however, that Nebraska's Business Corporation
Act, including the dissenters' rights statutes, is based
upon the 1984 version of the Model Business Corporation
Act. See, generally, 1995 Neb. Laws, L.B. 109. The
official comment 1 to § 12.01 of the Model Business
Corporation Act, which is similar to Neb. Rev. Stat.
§ 21-20,135 (Reissue 1997), has explained the meaning
of "all, or substantially all" in connection with a board of
directors' ability to conduct the usual and regular course
of business without shareholder approval, and we believe
that explanation is equally applicable to the phrase "all,
or substantially all" in the Nebraska dissenters' rights
statutes, § 21-20,138(1)(c). The comment states:

"The phrase 'all or substantially all,' chosen by the
draftsmen of the Model Act, is intended to mean what
it literally says, 'all or substantially all.' The phrase
'substantially all' is synonymous with 'nearly all' and
was added merely to make it clear that the statutory
requirements could not be avoided by retention of some
minimal or nominal residue of the original assets. A
sale of all the corporate assets other than cash or cash
equivalents is normally the sale of 'all or substantially
all' of the corporation's property. A sale of several
distinct manufacturing lines while retaining one or more
lines is normally not a sale of 'all or substantially all'
even though the lines being sold are substantial and
include a significant fraction of the corporation's former
business. . . . Similarly, a sale of a plant but retention of
operating assets (e.g., machinery and equipment), accounts
receivable, good will, and the like with a view toward
continuing the operation at another location is not a sale
of 'all or substantially all' the corporation's property."
*State ex rel. Columbus Metal v. Aaron Ferer & Sons*, 272 Neb.
758, 766-67, 725 N.W.2d 158, 165 (2006).

- 54 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

[17] As the Nebraska Supreme Court noted, "[w]ith regard to the transfer of corporate assets, the phrase 'all, or substantially all' or comparable phrases have been adopted in all 50 states." *Id*. at 767, 725 N.W.2d at 165. And then, after reviewing the holdings from multiple states interpreting the phrase, the court held:

> We agree with the principle recognized in the foregoing quoted material that an examination whether there has been a change in the nature of the underlying corporate business is central to a determination of whether there has been a sale of "all, or substantially all" of the corporation's property. Accordingly, we conclude that the phrase "all, or substantially all," as used in § 21-20,138(1)(c), means a sale of corporate assets that, quantitatively or qualitatively, would result in a fundamental change in the nature of the corporation. See *Sterman v. Hornbeck*, 156 Wis. 2d [556,] 565, 457 N.W.2d [874,] 878 [(1990)] (stating that "[t]he determinative factor is whether the sale changes the nature of the corporate activity").

*Id.* at 768, 725 N.W.2d at 166.

We make a similar finding here. The parties used the phrase "substantially all" in the context of the sale of units or assets of GIKK following the retirement of a member when he or she no longer could control the outcome of any such sale but maintained the right to monetarily take part if such sale occurred. Under these circumstances, the parties used a term of art commonly utilized in this context, and similarly to the court in *Kalkowski v. Nebraska Nat. Trails Museum Found.*, 290 Neb. 798, 862 N.W.2d 294 (2015), we find that as a legal term of art used in this context, the phrase "substantially all" should be construed in the manner described by the Nebraska Supreme Court in *State ex rel. Columbus Metal v. Aaron Ferer & Sons, supra*, and commonly used by legislators in all 50 states. Although we recognize that Neb. Rev. Stat. § 21-20,138 (Reissue 2012) has been repealed and dissenters' right statutes

- 55 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

now utilize different language, the language formerly used and defined informs our analysis here.

Having determined the unambiguous meaning of the phrase "substantially all" utilized by the parties in this contract, we now turn to the Appellants' arguments that several transactions following the execution of the contracts resulted in a sale of "substantially all" of the units of GIKK or of its assets or whether a fact issue remained in relation to determining this issue.

### (i) Addition of New Physicians and Members

The Appellants first argue that subsequent to their retirement, GIKK issued membership units in GIKK to seven new physicians for value; GIKK utilized that investment to acquire additional ownership interests in MSH; the additional investment resulted in increased distributions from MSH to GIKK and its members; and these events should be factored into the consideration as to whether this transaction constituted a sale of "substantially all" of the units of GIKK.

Within § 17.2 of the Operating Agreement, wherein the parties agreed to grant the Appellants a trailing interest in a future sale of substantially all of GIKK's units or assets, the Appellants explicitly agreed that "additional members may be added to [GIKK], which may also have the effect of reducing each Original Continuing Member's future share under this provision." As such, the addition of new members and dilution of GIKK's membership interests were specifically contemplated by the parties' agreement.

But the Appellants argue that requiring the seven new physicians to "buy in" for their investment should further inform the analysis. In requiring the investors to contribute capital for their respective membership interests (together with additional capital contributions from the existing members), GIKK was able to raise over $12 million that GIKK utilized to increase its investment in MSH. Following the acquisition of additional units in MSH, GIKK increased its ownership position in

- 56 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

MSH from approximately 25 percent to 35 percent. This obviously works against any concept of a divestiture of GIKK's assets that could trigger the contractual obligation. In short, the issuance of additional units in GIKK was specifically contemplated by the agreement and does not factor into the analysis on the GIKK units side of the equation, and the increase in GIKK's assets (as opposed to a divestiture) likewise works against the Appellants' argument.

But as Professor Morse indicates in his analysis (a matter we will discuss in greater detail later in the opinion), GIKK's acquisition of additional units in MSH had an additional consequence: Because MSH issued new units in MSH to accommodate GIKK's additional investment, the issuance of new units in MSH had a dilutive impact on the existing owners, including GIKK. In order to compensate its owners for that dilution, MSH paid cash to its existing owners, including GIKK, for the value associated with that dilution, which GIKK then distributed to its 14 existing members.

The Appellants argue that the dilution payment must be factored into the sale analysis in determining whether a sale of substantially all of GIKK's assets (its investment in MSH) took place.

As Professor Morse indicated in his report, GIKK's new investment in MSH resulted in the issuance by MSH of 557,750 new units to GIKK, which he states "represent[s] 13.3717 percent of the 4,171,173 units owned by physicians and physician-owned entities [in MSH] after the transaction." But because this issuance also results in a 13.3717-percent dilution to existing owners in MSH, MSH paid those owners, including GIKK, for that dilution in relation to their ownership interests among the physician and physician-owned entities (approximately 85 percent of MSH). Prior to this new investment, GIKK owned approximately 25 percent of MSH, which translates into approximately a 30-percent ownership among the physicians and physician-owned entities. As such, GIKK was paid for an approximately 4-percent dilutive

- 57 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

effect from its new investment (30 percent of 13.3717) but experienced a net gain in ownership because of the investment in 557,750 new units in MSH. Taken together, GIKK did receive a distribution of $5,994,926 for the dilutive effect on its 25-percent investment but experienced a net gain in its total investment in MSH from approximately 25 percent to 35 percent. Because GIKK expanded its investment from this transaction and did not decrease it, standing alone, this most certainly did not result in a sale of substantially all of GIKK's assets, and the dilutive effect on GIKK's membership units to add new members was specifically contemplated and allowed by the parties to the agreement. Viewed in isolation, this transaction did not result in a sale of substantially all of the assets or units in GIKK.

### (ii) Redemption of Dr. McCarthy's Units

The Appellants next argue that GIKK's amendment to the redemption price formula, along with Dr. McCarthy's subsequent redemption utilizing that formula, should likewise be considered as part of a sale of substantially all of GIKK's units or assets. As the Appellants note, at the time of Dr. McCarthy's redemption, Dr. McCarthy owned a 4.7619-percent interest in GIKK. In order to fund Dr. McCarthy's buyout, GIKK sold a portion of its interest in MSH. Taken as a percentage, after selling a small interest in GIKK, GIKK's interest in MSH was reduced from 35.0810696 percent to 34.97678 percent. The undisputed facts are that this equates with 1.67 percent of GIKK's position in MSH, which was liquidated to pay the redemption price.

[18] The redemption of Dr. McCarthy's small 4.7619-percent ownership interest in GIKK, like all obligatory retirement redemptions before, would not constitute a sale of "substantially all" of the units of GIKK by anyone's definition; nor would GIKK's apparent small liquidation of just over 1 percent of its ownership interest in MSH to obtain the money to redeem those shares constitute a sale of substantially all of

- 58 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

its assets. As the Nebraska Supreme Court noted in *State ex rel. Columbus Metal v. Aaron Ferer & Sons*, 272 Neb. 758, 768, 725 N.W.2d 158, 166 (2006), the determinative factor in assessing whether a sale constitutes all or substantially all of the business ""'is whether the sale changes the nature of the corporate activity."'" The change in formula price that ultimately impacted the redemption of Dr. McCarthy's small interest in GIKK and the liquidation of a minor portion of holdings in MSH to fund that redemption most certainly did not change the nature of GIKK's corporate activity. GIKK remained an investment tool to attract physicians to the practice who then benefited by returns generated from GIKK's investment in MSH. And GIKK's investment in MSH was only minimally changed to accomplish that redemption. Again, we find that reasonable minds could not differ in finding that Dr. McCarthy's small redemption and the small liquidation event it took to accomplish it did not result in a sale of "substantially all" of the units of GIKK or its assets, as they had no meaningful impact on either. This portion of the Appellants' assignment of error fails.

### (iii) Sale of 49.9-Percent Interest in MSH

Finally, the Appellants assert that GIKK's sale of approximately 49.9 percent of its interest in MSH to a strategic partner constitutes a sale of substantially all of its assets. The unrefuted record shows that GIKK, like all minority owners in MSH, decided to relinquish 49.9 percent of its then-current interest in MSH in favor of gaining Surgery Center Holdings as a strategic partner. To that end, the record reveals that the then-current owners believed that this strategy would best help grow the value of MSH and, concomitantly, their investments in it. But to place the results of this transaction in perspective, at the time of Dr. Gross' retirement, GIKK owned an approximately 25-percent minority ownership interest in MSH. And although GIKK grew its investment to nearly 35 percent, due to the addition of new physician investors whose

- 59 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

investment was used to grow GIKK's investment in MSH following the transaction, GIKK still retained an approximately 17.5-percent interest in MSH following the sale. And GIKK subsequently grew the investment to 18.39954 percent of MSH. Qualitatively, both before and after the sale, GIKK was a minority holder in MSH, GIKK was continuously utilized as an investment tool to attract physicians to join the P.C.'s medical practice, GIKK's primary asset was and remained its interest in MSH, the physicians in the P.C. continuously used MSH's hospital to perform procedures for their patients, and the ownership and management structure in GIKK remained the same. The reduction in interest in MSH designed to attract a strategic partner in MSH did not change the qualitative nature of GIKK, which remained a minority interest holder in MSH to be utilized as an investment tool to attract physician partners in the P.C. And although the Appellants argue that the inclusion of a strategic partner qualitatively changed the nature of MSH, the issue is whether it qualitatively changed the nature of GIKK. The unrefuted facts demonstrate that it did not.

From a quantitative standpoint, as 3 Model Business Corporation Act Ann. § 12.01, official comment at 12-3 (3d ed. 1984 & Supp. 1996), provides, in part, "The phrase 'substantially all' is synonymous with 'nearly all' and was added merely to make it clear that the statutory requirements could not be avoided by retention of some minimal or nominal residue of the original assets." Here, again, no reasonable person on this record would conclude that GIKK's retention of over 50 percent of its investment in MSH could constitute some minimal or nominal residue from its original investment.

In sum, when performing either a quantitative or a qualitative analysis, we find, on this record, that reasonable minds cannot differ that the sale of GIKK's 49.9-percent interest in MSH shares did not, when analyzed in isolation, constitute a sale of substantially all of GIKK's assets.

- 60 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

But the thrust of the Appellants' argument here is that when the transactions are viewed in the aggregate, they amount to a sale of substantially all of the units or assets in GIKK. We disagree. In analyzing the units in GIKK, the addition of seven new physicians had a dilutive effect on the members and the "Original Continuing Members," but that dilution was contemplated and allowed by the parties and therefore does not factor into the analysis. And GIKK's redemption of Dr. McCarthy's units upon retirement had a minimal impact on GIKK's unit side and does not constitute a sale of substantially all the units, applying the definition of that term as previously explained.

But the impact of the transactions on GIKK's assets was more significant. GIKK's use of capital contributions to acquire additional units in MSH resulted in a payout for the dilutive effect on the existing owners of MSH. GIKK's liquidation of just over approximately 1 percent of its interest in MSH to fund Dr. McCarthy's buyout further reduced GIKK's position in MSH. And although the Appellants do not discuss it in their brief, Professor Morse identified additional investments in MSH by Midwest Neuroscience Surgical, LLC, which resulted in further dilution payments from MSH to its existing owners, including GIKK (approximately 1.38 percent determined by taking 29 percent of the 1.2839-percent dilutive impact from the first investment and 40 percent of the 2.5-percent dilutive impact from the second investment). And finally, GIKK, like other owners, sold 49.9 percent of its ownership position in MSH to Surgery Center Holdings in order to attract a strategic partner in MSH's hospital with a view toward growing that investment.

But even when viewed in the aggregate, GIKK began with an approximately 25-percent interest in MSH, grew it to nearly 35 percent, and, at its lowest point, owned nearly 17.52 percent of MSH before growing it again to over 18 percent. Even when considering the impact of the dilution payments made by MSH to cover the dilutive impact from the issuance of new

- 61 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

ownership units in MSH, GIKK divested itself of less than 60 percent of its highest position of ownership or potential ownership in MSH. As we mentioned before, when undergoing a qualitative analysis, none of these transactions, when viewed individually or in the aggregate, changed the qualitative nature of GIKK. And from a quantitative analysis, reasonable minds cannot differ that a less than 60-percent divestiture of assets does not amount to GIKK's divesting itself of nearly all of its units or assets, or the retention of some minimal or nominal residue of that investment.

On this record, we find no dispute of material fact governing the relevant facts regarding the contract itself or the individual transactions that took place. And even assuming without deciding that all of the transactions argued by the Appellants constituted "sales" of units or assets of GIKK, when applying these facts to the legally determined definition of "substantially all," we find that reasonable minds cannot differ in that application, and the district court did not err in granting summary judgment on this issue.

### (b) Derogation of Rights

The Appellants next argue that even if the transactions did not constitute a sale of substantially all of the units in GIKK or its assets, the transactions themselves violated a separate contractual obligation the Appellees promised the Appellants. That is, the transactions derogated the Appellants' rights under the Operating Agreement.

[19] In order to determine whether the transactions themselves derogated the Appellants' rights under the Operating Agreement, we must first interpret that agreement to ascertain the meaning of the derogation provision. The interpretation and construction of a contract are questions of law, which a court can resolve on summary judgment. See *Kaiser v. Allstate Indemnity Co.,* 307 Neb. 562, 949 N.W.2d 787 (2020).

[20-22] The operative language to interpret and construe is found in § 17.2 of GIKK's Operating Agreement. A contract

- 62 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

should be read so that all of its terms are given meaning. See *Acklie v. Greater Omaha Packing Co.*, 306 Neb. 108, 944 N.W.2d 297 (2020). A court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include. *Kier v. County of Hall*, 30 Neb. App. 1, 963 N.W.2d 74 (2021). A court should avoid interpreting contract provisions in a manner that leads to unreasonable or absurd results that are obviously inconsistent with the parties' intent. *Id*.

Here, as the parties acknowledge, in § 17.2 of GIKK's Operating Agreement, GIKK provided for a trailing interest for certain formerly redeemed members (referred to as the "Original Continuing Members") in proceeds from GIKK if GIKK sold "substantially all of the Units in [GIKK] owned by the Members of [GIKK] (or substantially all of the assets owned by [GIKK])." But within the same section of the Operating Agreement, the parties provided:

> Each Original Continuing Member also agrees that additional members may be added to [GIKK], which may also have the effect of reducing each Original Continuing Member's future share under this provision [and] that the Members of [GIKK] may amend this Operating Agreement (and enter into other agreements) without the consent of any former Original Continuing Member, provided that no such amendment (or other agreements) would operate in derogation of the rights of such former Original Continuing Member.

The derogation of rights language here provides the basis for the Appellants' contention. The Appellants argue that "[b]y selling [GIKK's] equity and assets, and then siphoning tens of millions of dollars of proceeds out of GIKK, the Appellees reduced the value of GIKK, and derogated the rights of Drs. Gross and Kelly." Brief for appellants at 20. Stated differently, the Appellants argue that the derogation of rights provision should be interpreted to mean that the Original Continuing Members were entitled to proceeds upon the sale of

- 63 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

substantially all of GIKK and that the members of GIKK were contractually obligated not to reduce its value until such sale eventually took place. We disagree.

In construing the meaning of this passage, the language clearly and unambiguously provided that the only right the Original Continuing Members reserved following their redemptions was to receive a participatory share in proceeds if substantially all of the units or assets were eventually sold, not upon a sale of less than substantially all of such units or assets. And if the Appellants desired to forbid GIKK's members from reducing GIKK's value prior to a sale of substantially all of the business, they could have so provided. As we stated above, a court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include. *Kier v. County of Hall*, 30 Neb. App. 1, 963 N.W.2d 74 (2021). The Operating Agreement does not provide for any protection in favor of the Original Continuing Members from amendments to the Operating Agreement or other agreements that might reduce GIKK's value prior to a sale of substantially all of its units or assets.

In fact, the language of the Operating Agreement directly contemplates GIKK's future acquisition of new members, which would dilute the Original Continuing Members' interests, and forbids amendments or other agreements that would derogate the rights the Original Continuing Members preserved in the agreement. The only right the Original Continuing Members preserved was the right to participate in proceeds in the event of a sale of substantially all of the units or assets. We are not free to speculate as to terms that the parties did not see fit to include in the contract, as the Appellants suggest by their purported meaning of the language the parties actually utilized.

When attaching the meaning to the language actually utilized by the parties, we reject the Appellants' argument that the transactions, when analyzed in isolation or in the aggregate, constituted a derogation of the rights the Appellants reserved

- 64 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

in the contract. The transactions involving the issuance of new units in GIKK to seven new members most certainly did not act in derogation of the Appellants' rights, as the dilution of the Appellants' interests was specifically contemplated by the language actually used in the Operating Agreement. The redemption of Dr. McCarthy's units and remuneration GIKK paid for it, albeit different from that received by the Appellants, due to an amended payment structure, similarly did not derogate the Appellants' right to participate in a future sale of substantially all of GIKK's units or assets, if and when that happens. And at least one physician testified that Dr. McCarthy received less under the new formula than he would have under the old formula. And the sale of a 49.9-percent interest in MSH to a strategic partner likewise did not result in a derogation of the Appellants' future right to share in the sale of substantially all of GIKK. Having rejected the Appellants' interpretation of the derogation provision in the contract, we find, on this record, when applying the undisputed facts governing the transactions themselves, that reasonable minds could not differ that these transactions did not result in a derogation of the Appellants' rights reserved in the contract, as they did not take away the Appellants' right to participate in a future sale of substantially all of GIKK, if and when that happens. The district court did not err in granting summary judgment in favor of the Appellees as it relates to this issue.

## 2. Exclusion of Expert Testimony

We next address the Appellants' assignment of error that the district court erred in excluding Professor Morse's testimony (a) based upon its finding that Professor Morse's testimony consisted entirely of "'legal conclusions'" when Professor Morse expressed factual opinions that quantified the extent of financial harm caused to the Appellants by the Appellees and (b) on *Daubert/Schafersman* grounds when the Appellees' expert agreed with Professor Morse's "'method.'"

- 65 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

Summarized, Professor Morse's report states six opinions: (1) that GIKK had sold "'substantially all'" of its assets through "sales of LLC units" and underlying assets, (2) that GIKK and its managers entered into agreements "in derogation of the rights" of Drs. Gross and Kelly, (3) that Drs. Gross and Kelly have been harmed to the extent of the damages set forth in their answers to interrogatories, (4) that other distributions from GIKK to its members from the proceeds of unit sales and from redemption proceeds likely caused additional damages to Drs. Gross and Kelly, (5) that GIKK and its managers breached duties of care and loyalty to Drs. Gross and Kelly, and (6) that Drs. Gross and Kelly are entitled to full redemption of their interests in GIKK based on valuing the remainder of the underlying assets of GIKK.

The district court found that Professor Morse's opinions were not admissible and did not consider those opinions in reaching its decision here. The Appellants assign error to that ruling, arguing that the opinions did not consist entirely of legal conclusions and that it was error to reject the opinions on *Daubert/Schafersman* grounds. We will address those arguments independently.

### (a) Legal Conclusions

[23] Pursuant to Neb. Rev. Stat. § 27-702 (Reissue 2016), "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." And, as the Nebraska Supreme Court stated in *Woodmen of the World v. Nebraska Dept. of Rev.*, 299 Neb. 43, 62-63, 907 N.W.2d 1, 15 (2018):

> Expert testimony is relevant and admissible only if it tends to help the trier of fact understand the evidence or determine a fact issue, and expert testimony concerning a question of law does not tend to accomplish either of

- 66 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
34 NEBRASKA APPELLATE REPORTS
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

these goals. Consequently "'expert testimony concerning a question of law is generally not admissible in evidence.'"

Here, one of the reasons why the district court excluded Professor Morse's testimony was that

> [e]ach of [Professor Morse's] opinions contain[s] inadmissible legal conclusions that interpret the terms of Section 17.2. [Professor] Morse's opinions make ultimate conclusions about what certain terms such as "substantially all" and "derogation" mean when used in the context of the contract. These types of opinions are simply not admissible as expert testimony. These legal conclusions are not helpful to the trier of fact and, therefore, are inadmissible.

We agree in part. As we have explained in earlier portions of this opinion, the meaning of an unambiguous contract is a question of law. *Lassalle v. State*, 307 Neb. 221, 948 N.W.2d 725 (2020). Having found that both the meaning of the phrase "substantially all" and the derogation of rights provision utilized by the parties could be ascertained from the contract itself and were determined as a matter of law, we reject all portions of Professor Morse's opinions insofar as they relate to his own attempts to define that term and provision. See *Woodmen of the World v. Nebraska Dept. of Rev.*, 299 Neb. at 63, 907 N.W.2d at 15 (holding that ""expert testimony concerning a question of law is generally not admissible in evidence"""). But we read Professor Morse's opinions as constituting both an attempt to provide testimony governing the definition of those terms and as an attempt to opine on how the transactional facts should be applied to those definitions. As it relates to his attempt to apply facts to the legal definition of those terms, we will discuss that in connection with the Appellants' second argument.

### (b) *Daubert/Schafersman* Analysis

As it relates to Professor Morse's attempt to provide opinions on how facts should be applied to the law in this context,

- 67 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

we return to the language of § 27-702. As we stated previously, § 27-702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Once the meaning of the terms of the parties' contract is ascertained, the only question left for the district court was to determine whether there were any questions of material fact that prohibited granting summary judgment here, or whether, on this record, the Appellees were entitled to judgment as a matter of law. The gravamen of the Appellants' arguments here was that the transactions described before either constituted a sale of substantially all of GIKK's units or assets or resulted in a derogation of the Appellants' rights. The transactions involved the addition of seven new members to GIKK for value, the redemption of Dr. McCarthy's membership interest for value under a new remuneration formula, and the eventual sale of approximately 49.9 percent of GIKK's interest in MSH to a strategic partner.

We read Professor Morse's report as addressing both the topics of the derogation of rights provision and the sale of substantially all of the units or assets provision. As it relates to the former, Professor Morse interpreted the contract in a manner to suggest that the Appellees were forbidden from reducing the value of GIKK until a sale of substantially all of it. As such, his opinions are based upon a faulty premise. To that end, his opinions on this topic are not relevant, reliable, or helpful, and the district court did not abuse its discretion in failing to admit them.

But Professor Morse's analysis of the transaction in reference to the issue of a potential "substantial sale" was useful. That is, in addition to documenting the specific nature of the transactions themselves, he identifies the distributions made to members for dilution payments made from MSH to owners to

- 68 -

Nebraska Court of Appeals Advance Sheets
34 Nebraska Appellate Reports
GROSS v. GIKK INVESTMENTS
Cite as 34 Neb. App. 34

compensate for the dilutive impact on their ownership positions, along with identifying what specific remuneration was paid, how it was calculated, and how those payments flowed. But even considering that information, which was helpful to the analysis, as we noted before, we find that the series of transactions did not constitute a sale of substantially all of the units or assets of GIKK as we have defined those terms in the contract. To be clear, even when considering that portion of Professor Morse's report that was helpful in unpacking the transactions that occurred, we find that the transactions, taken in isolation or in the aggregate, do not constitute a sale of substantially all of the units or assets in GIKK, for the reasons we set forth before. As such, assuming without deciding that a small portion of Professor Morse's report was admissible, there was no prejudice associated with the district court's decision rejecting its admissibility.

Because the Appellants do not separately assign error to the court's determinations regarding their separate claims for breach of fiduciary duty, we do not address them.

## VI. CONCLUSION

For the reasons stated above, we affirm.

Affirmed.